IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | |
|---|---|
| Melvin Jackson, Elizabeth Jackson, and minors, Melody Jackson, Makala Jackson, and Madison Jackson, by and through their parents Melvin Jackson and Elizabeth Jackson, <br><br> Plaintiffs, <br><br> vs. <br><br> United States of America, <br><br> Defendant. | C.A. No. 5:08-03876-MBS <br><br> **ORDER AND OPINION** |

Plaintiffs Melvin Jackson ("Mr. Jackson") and Elizabeth Jackson ("Ms. Jackson") and their three minor children Melody, Makala and Madison filed the within action under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* on November 24, 2008.[1] Plaintiffs contend that they were not properly treated for lead poisoning and seek damages for negligence, intentional infliction of emotional distress, and breach of fiduciary duty. This case is before the court on Defendant's motion for summary judgment, which was filed on September 11, 2009. On October 6, 2009, Plaintiffs responded to the motion for summary judgment. On October 14, 2009, Defendant filed its reply.

This case is also before the court on Defendant's February 12, 2010 motion to exclude the testimony of Dr. David Cantor ("Dr. Cantor"). On March 3, 2010, Plaintiffs responded to the motion

---

[1] Plaintiffs' medical provider, the Orangeburg Family Health Center, Inc. ("FHC") is an entity receiving federal grant money from the United States Public Health Service. Pursuant to 42 U.S.C. § 233(h), the United States Department of Health and Human Services has deemed FHC and its employees, who are medical providers, to be employees of the federal government for purposes of coverage under the Federal Tort Claims Act. Therefore, pursuant to 28 U.S.C. § 2679, the United States is the only proper defendant in this case.

to exclude Dr. Cantor's testimony. On April 12, 2010, the court held a hearing on Defendant's motion for summary judgment and motion to exclude expert testimony.

**FACTS**

The facts in the light most favorable to Plaintiffs are as follows. On February 14, 2005, infant Madison Jackson was taken to the Orangeburg Family Health Center, Inc. ("FHC") for a pediatric visit. Entry 22-2 at 10. Madison presented with a matted eye and was diagnosed with pinkeye by Dr. Virginia Wagner ("Dr. Wagner"). Entry 22-2 at 10. During this visit, Dr. Wagner discovered that Madison may have been exposed to lead paint because Plaintiffs were renovating an old house. *Id.* A blood lead level ("BLL") screening was ordered for Madison. Entry 22-2 at 10. LabCorp analyzed the test and found Madison's BLL to be 11 µg/dL. Entry 22-2 at 13. On February 16, 2005, LabCorp reported these results to South Carolina Department of Health and Environmental Control ("SCDHEC"). Entry 22-2 at 13. According to the test results, Center for Disease Control ("CDC") guidelines recommended that a repeat test be given on a fresh blood specimen. Entry 22-2 at 13. FHC received the results of the initial screening on February 17, 2005. Entry 22-2 at 13. A notation on the test results indicates that a letter was mailed to Ms. Jackson on February 17, 2005 regarding the results. Entry 22-2 at 13.

On February 19, 2005, Ms. Jackson received a phone call from FHC and was told that Madison's lead levels were "a little high" and that his lead level needed to be rechecked. Entry 25 at 2. Madison had a previously scheduled appointment on February 23, 2005, and Ms. Jackson requested that Madison's lead levels be rechecked at that time. Entry 25 at 2. A notation on the test results corroborates this request. Entry 22-2 at 13 (See handwritten note stating: "Come now!? Has appt. this month."). A letter dated February 19, 2005 indicates that FHC attempted to notify

2

Plaintiffs of Madison's test results and the need for re-testing. Entry 22-2 at 14. Plaintiffs received no pamphlets or brochures on lead exposure from FHC at this time. Entry 25 at 2.

On February 23, 2005, Madison presented for his scheduled appointment. Entry 22-2 at 9. Madison was seen by Nurse Patricia Armstrong ("Nurse Armstrong"). Entry 22-2 at 9. Ms. Jackson asked Nurse Armstrong about the lead screening and was told that everything was generally "fine," but that Madison's iron was low. Elizabeth Jackson Dep. at 48. Madison's medical chart for that appointment indicates that Nurse Armstrong discussed lead exposure, avoidance, and monitoring with Ms. Jackson. Entry 22-2 at 9. No follow-up BLL test was performed on Madison during this visit. Ms. Jackson was asked to return in thirty days with Madison. Entry 25 at 2.

On March 8, 2005, Dr. Wagner received a letter from SCDHEC outlining the "typical follow-up testing regimen" for an elevated BLL test. Entry 22-3 at 2. The letter indicates that for a test result of 10-19 µg/dL, a follow-up blood screen should be performed within three months. Entry 22-3 at 2. The letter also indicated that an environmental investigation by DHEC could not be requested unless a child had a BLL of at least 20 µg/dL or two screenings at least three months apart with levels between 15 and 19 µg/dL. Entry 22-3 at 2.

On March 19, 2005, Madison was taken to FHC because of severe diarrhea. Entry 25-1 at 5. No discussions of lead poisoning occurred during this visit. Entry 25-1 at 5. On May 25 or 26, 2005, which was approximately three months and seven days after FHC received the results of Madison's original BLL screening, Madison received a follow-up BLL screening. Entry 22-2 at 8; Entry 22-3 at 3. LabCorp analyzed the test and found Madison's BLL to be 25 µg/dL. Entry 22-2 at 11. On May 28, 2005, these results were reported to the SCDHEC. Entry 22-2 at 11. CDC guidelines recommended that a repeat test be given on a fresh blood specimen. Entry 22-2 at 11.

FHC received the results of the screening on May 31, 2005. Entry 22-2 at 11. Madison's medical chart indicates that on May 31, 2005, FHC contacted Ms. Jackson regarding the results, and notified her that Madison needed to be re-tested. Entry 22-2 at 8. The notations state: "mother verbalized a good understanding. Mother reports she will have redrawn June 1." Entry 22-2 at 8. In addition, the notations indicate that a "Look Out for Lead" pamphlet was mailed to Ms. Jackson on May 31, 2005. Entry 22-2 at 8. Plaintiffs, however, state that they never received this pamphlet from FHC. Elizabeth Jackson Dep. at 51:24-25, 52:1-5; Aff. of Melvin Jackson at 1.

On June 22, 2005, Dr. T. Caldwell received a letter from South Carolina DHEC outlining the "typical follow-up testing regimen" for Madison's May 2005 elevated BLL test. Entry 22-3 at 3. The letter states that for a test result of 20-44 µg/dL, a follow-up blood screen should be performed within the time period of one month to one week and indicates that the higher the BLL, the more urgent the need for another test. Entry 22-3 at 3. That same day, Madison went to FHC for follow-up treatment for a urinary tract infection. Entry 22-2 at 6. Madison received his third BLL screening that day. Entry 22-2 at 6. Madison's medical chart from that day indicates that a lead informational pamphlet was given to Ms. Jackson during this doctor visit. Entry 22-2 at 7.

LabCorp analyzed the June 22, 2005 test and found Madison's BLL to be 33 µg/dL. Entry 22-2 at 12. On June 24, 2005, LabCorp reported these results to SCDHEC. *Id.* FHC received the results of the screening on June 24, 2005. Entry 22-2 at 12. Also on June 24, 2005, Madison was brought to FHC for treatment of the flu and diaper rash. Entry 22-2 at 5. Madison's medical chart from that doctor visit indicates that Madison was diagnosed with plumbism (lead poisoning) and that Plaintiffs were referred to the DHEC lead clinic. Entry 22-2 at 5.

On June 28, 2005, Melody Jackson received a BLL screening. Entry 22-2 at 17. LabCorp

4

analyzed this test and found Melody's BLL to be 9 µg/dL. Entry 22-2 at 18. On June 29, 2005, LabCorp reported these results to SCDHEC. *Id.* The test results indicate that since Melody's BLL was below 10 µg/dL, no follow-up testing was necessary. *Id.* On June 28, 2005, Rion Langston and Pat Rise from SCDHEC conducted a lead risk assessment at Plaintiffs' residence. Entry 22-4 at 2.

Madison's medical chart indicates that on June 29, 2005, Ms. Jackson and Makala Jackson received BLL tests. Entry 22-2 at 4. The notations on Madison's chart from that day indicate that FHC contacted DHEC concerning alternative housing and social worker involvement. Entry 22-2 at 4. LabCorp analyzed Ms. Jackson and Makala's tests and found Ms. Jackson's BLL to be 12 µg/dL, and Makala's BLL to be 35 µg/dL. Entry 22-2 at 16, 19. LabCorp reported Ms. Jackson's test results to SCDHEC on June 30, 2005, and Makala's on July 1, 2005. Entry 22-2 at 16, 19. FHC received Ms. Jackson and Makala's test results on July 5, 2005. Entry 22-2 at 16, 19.

Madison's medical chart indicates that on July 1, 2005, Dr. Charles Kilgore ("Dr. Kilgore") had a long discussion with Mr. and Ms. Jackson; Sandra Johnson ("Johnson"), a social worker; and a Dr. Niemyer from SCDHEC. Entry 22-2 at 4. The notations indicate that DHEC had identified Plaintiffs' house as the source of the lead, but that Plaintiffs refused to move immediately and were trying to get assistance with the move. Entry 22-2 at 4. Dr. Kilgore indicates that he spoke with a Dr. J. Routt Reigart ("Dr. Reigart"), a state lead specialist, that day who indicated that because lead is slowly absorbed, there should be no problem with the family staying in the house another four days over the July 4th holiday weekend, but recommended that Plaintiffs begin taking "Succimer Chelating Agent," which was then prescribed to Plaintiffs. Entry 22-2 at 4.

On July 3, 2005, Plaintiffs received a phone call from Dr. Kilgore who informed Plaintiffs that their house was the source of the lead poisoning and that Madison was "a couple points away

from being brain damaged." Entry 25-1 at 4. Dr. Kilgore told Plaintiffs that they had to vacate their house immediately. Entry 25-1 at 4. Plaintiffs temporarily moved into a motel until they could find more permanent housing. Entry 25-1 at 4. Ms. Jackson was told by Johnson that the prescribed medicine was experimental and that Ms. Jackson should not give it to Madison. Entry 25-1 at 4.

As indicated on both Madison and Melody's medical charts, Dr. Kilgore spoke with Ms. Jackson about the family's elevated lead levels on July 6, 2005. Entry 22-2 at 4; Entry 22-2 at 17. The notations indicate that Ms. Jackson expressed her disbelief in the testing and disbelief that Plaintiffs' house was the source of the lead. Entry 22-2 at 4, 17. The notation also states that Ms. Jackson refused to take the prescribed medication, and was seeking a second opinion from a doctor in Columbia. Entry 22-2 at 4, 17. Dr. Kilgore indicates that he notified SCDHEC of the situation, but that they stated they had to wait for a final testing of the home before reporting the situation to the Department of Social Services. Entry 22-2 at 4, 17.

On July 11, 2005, Mr. Jackson received a BLL screening and Makala received her second BLL screening. Entry 22-2 at 15, 20. LabCorp found Mr. Jackson's BLL to be 6 μg/dL and Makala's BLL to be 27 μg/dL. Entry 22-2 at 15, 20. Because Mr. Jackson's BLL was below 10 μg/dL no follow-up testing was necessary. Entry 22-2 at 20. Makala, on the other hand, required follow-up testing. Entry 22-2 at 15. The results of the July 11, 2005 BLL screening were reported to SCDHEC on July 12, 2005. Entry 22-2 at 15, 20. FHC received the results on July 14, 2005. Entry 22-2 at 15, 20.

On July 15, 2005, Ms. Jackson was sent a letter from SCDHEC containing the results of the lead risk assessment conducted at Plaintiffs' home. Entry 22-4 at 2. The letter contained the following test results: 1) dust sampling from floors: 46 μg/sq. ft. to 900 μg/sq. ft., which is over the

6

legal limit of 40 µg/sq. ft.; 2) window sills: above the legal limit of 250 µg/ sq. ft.; 3) lead-based paint" above the legal limit of .7 mg/ sq. cm. on interior and exterior walls and floors; 4) lead along the drip line at a level of 4700 ppm; and 5) water samples: below the legal limit for lead. Entry 22-4 at 2. SCDHEC recommended that Plaintiffs find someone certified in lead-based paint abatement to aid them in proper and safe repair of the house and recommended the replacement of several contaminated components of the house. Entry 22-4 at 3. Madison has subsequently been determined to be cognitively delayed. Entry 25 at 4.

## DISCUSSION

I. **Summary Judgment Standard**

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

At the hearing, Plaintiffs conceded their claims for intentional infliction of emotional distress and breach of fiduciary duty. Therefore, the only claim to be addressed on summary judgment is Plaintiff's medical malpractice claim. Plaintiffs' medical malpractice claim is based on FHC's failure to timely diagnose, report, and treat lead poisoning; and failure to warn Plaintiffs of the risks associated with lead poisoning. *Id.* Defendant's motion for summary judgment is based upon Plaintiffs' failure to identify expert witnesses by the scheduling order's August 5, 2009 deadline. Specifically, Plaintiff identified Dr. Cantor as an expert witness on October 6, 2009, but never sought leave from the court to name expert witnesses out of time. In addition, Defendant argues that Dr. Cantor is not qualified to give expert testimony on the standard of care in this case.

**II.     Medical Malpractice Case Requirements**

Under the Federal Tort Claims Act, courts look to the law of the state where the act or omission at issue occurred in order to determine whether a complaint in negligence warrants relief. *United States v. Muniz*, 374 U.S. 150, 152 (1963) (citing 28 U.S.C. § 1346(b)). Thus, South Carolina law provides the appropriate standard in this case.

In medical malpractice cases, the burden of proof to demonstrate negligence, proximate cause, and injury is always on the plaintiff. *Dumont v. United States*, 80 F. Supp. 2d 576, 581 (D.S.C. 2000). To establish liability in a medical malpractice case, plaintiffs must prove by a preponderance of the evidence: 1) what the recognized and generally accepted standards, practices

8

and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances; 2) the physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures; 3) such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiffs' injuries; and 4) the plaintiffs were injured. *David v. McLeod Reg'l Med. Center*, 626 S.E.2d 1, 3-4 (S.C. 2006).

Expert testimony is typically required in medical malpractice actions. *Green v. Lilliewood*, 249 S.E.2d 910, 912 (S.C. 1978). Plaintiffs generally must use expert testimony to establish the required standard of care and the defendant's failure to conform to that standard. *Pederson v. Gould*, 341 S.E.2d 633, 634 (S.C. 1986). However, expert testimony on the standard of care is not mandated when the "subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant." *Pederson*, 341 S.E.2d at 634 (citing *Botehlo v. Bycura*, 320 S.E.2d 59, 62 (S.C. Ct. App. 1984)). Expert testimony is also typically required to establish proximate cause. *Bramlette v. Charter-Medical-Columbia*, 393 S.E.2d 914, 916 (S.C. 1990).

### III. Untimely Identification of Expert

Defendant argues that Plaintiffs' untimely expert testimony should not be considered for purposes of summary judgment or admitted at trial. Defendant states that Plaintiffs' expert testimony was not provided to Defendant until two months after the court-imposed deadline, after Defendant filed its motion for summary judgment, and less than one month before the end of discovery. Plaintiffs contend that excluding Dr. Cantor's testimony would be a drastic and inequitable remedy and would essentially dismiss the entire case.

While a Scheduling Order is not to be disregarded, *see Campbell v. Gala Indus., Inc.*, Civil Action No. 6:04-2036-RBH, 2006 WL 1285107, at *1 (D.S.C. 2006), this court is constrained to agree with Plaintiffs that the exclusion of this testimony due to its untimeliness would prejudice Plaintiffs' case disproportionately to the harm caused by the late identification. *Dove v. Codesco*, 569 F.2d 807, 810 (4th Cir. 1978) ("Against the power to prevent delays must be weighed the sound public policy of deciding cases on their merits."). Accordingly, the court turns to Dr. Cantor's expert qualifications.

**IV.    Dr. Cantor's Qualifications**

Defendant argues that Dr. Cantor, a neuropsychologist, is not qualified to testify on the applicable standard of care in this case because he has no medical training. Defendant also argues that even if a non-medical expert could testify as to the applicable standard of care in this case, Dr. Cantor is not qualified to give such testimony because: 1) he has no medical experience in pediatrics, 2) he has performed no research or writing on the standard of care for pediatricians in treating lead poisoning, and 3) he has no teaching experience on the subject of lead exposure in pediatric cases. Plaintiffs concede that Dr. Cantor lacks pediatric medical training, but contend that Dr. Cantor is qualified to testify based on his experience in the area of pediatric neuropsychological development and his interaction with pediatricians.

Federal Rule of Evidence 702 provides that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id.* The court's role in considering the admissibility of expert testimony under Rule 702 is to assess whether the evidence is sufficiently reliable and relevant. *See Kumho Tire Co, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). To qualify as an expert, the expert must possess some special skill, knowledge, experience, training, or education concerning the particular issue or product before the court. *Thompson v. Queen City, Inc.*, No. Civ. A. 2002359-18, 2002 WL 32345733 at *1 (D.S.C. 2002). In cases where a party seeks to qualify a witness as an expert based upon experience, the district court must require the experiential witness to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).

The court, having questioned counsel on Dr. Cantor's qualifications, finds that Dr. Cantor is not qualified to testify as to the standard of care of pediatricians. As a neuropsychologist and not a medical doctor, Dr. Cantor has no direct experience with the standard of care in pediatric lead poisoning cases. Moreover, interaction with pediatricians, even on a day-to-day basis, is insufficient to provide Dr. Cantor with the necessary experience to provide a relevant and reliable opinion in this case. Therefore, if the case continues to trial, Dr. Cantor will not be permitted to expound upon the standard of care in pediatric lead poisoning cases or proximate causation.

## V. Common Knowledge Exception

Plaintiffs argue that even if Dr. Cantor is not permitted to testify, expert testimony is not necessary in this case because a jury could conclude, based upon common knowledge, that FHC

deviated from the standard of care in this case. First, Plaintiffs argue that FHC's failure to follow SCDHEC guidelines with regard to the time line for follow-up treatment of lead poisoning is so negligent that no special skill, training or experience is required for a juror to reach that conclusion. Second, Plaintiffs argue that Madison's treating physician failed to notify SCDHEC of Madison's elevated BLL as is required under S.C. Code Ann § 44-53-1380 and that this is negligence per se.

Where evidence permits the jury to "recognize or infer a breach of duty without the aid of expert testimony," expert testimony is not required for a case to go to a jury. *Stallings v. Ratliff*, 356 S.E.2d 414, 417 (S.C. Ct. App.1987). Whether the common knowledge exception applies in a medical malpractice case depends on the particular facts of the case. *Sharpe v. South Carolina Dept. of Mental Health*, 354 S.E.2d 778, 780 (S.C. Ct. App.1987). The court finds that this case is not one in which the common knowledge exception applies. First, because the SCDHEC time line for follow-up treatment of lead poisoning is a guideline as opposed to a strict requirement, it is open to interpretation and therefore is not common knowledge. The facts of this case indicate that expert testimony is necessary to demonstrate the medical significance, if any, of the delay in retesting Madison's BLL. Second, any failure by Madison's treating physician to notify SCDHEC of Madison's elevated BLL level is insufficient to demonstrate negligence per se. This is because the LabCorp test results, which were sent to FHC, clearly indicate that LabCorp notified SCDHEC of each elevated BLL test. Therefore, the court finds that the common knowledge exception is not applicable.

## **CONCLUSION**

Dr. Cantor is not qualified to testify as to the standard of care in this case. Because Plaintiffs cannot establish the standard of care in their medical malpractice claim, Defendant's

motion for summary judgment is **granted**.  Entry 22.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

May 28, 2010
Columbia, South Carolina